**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **CHRISTY BROWN,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO. 5:24-cv-218 (MTT)** |
| ) | |
| **BUTTS COUNTY SCHOOL SYSTEM,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**ORDER**

Christy Brown filed this action against her former employer, the Butts County

School System ("BCSS"), alleging discrimination and retaliation under the Americans

with Disabilities Act ("ADA"). ECF 6. BCSS has moved for summary judgment on all of

Brown's claims. ECF 15. For the following reasons, BCSS's motion for summary

judgment (ECF 15) is **GRANTED**.

**I. BACKGROUND[1]**

**A. Factual Background**

Brown was employed by BCSS from 2002 until 2023. ECF 15-2 ¶ 1; 19-1 ¶ 1.

Brown held several positions during her employment at BCSS, including Executive

Assistant to the Director of Teaching and Learning, a position she held from 2018 until

2022. ECF 15-2 ¶ 4, 17; 19-1 ¶ 4, 17. In that role, Brown was responsible for

---

[1] Unless otherwise stated, the facts are undisputed and are viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

coordinating the district-wide state testing, which "required diligence in completing tasks on established timelines." ECF 15-2 ¶ 6; 19-1 ¶ 6.

### 1. 2021-22 school year

In July 2021, Brown's 24-year-old daughter was diagnosed with cancer. ECF 15-2 ¶ 8; 19-1 ¶ 8. On July 26, 2021, Brown requested intermittent leave under the Family and Medical Leave Act ("FMLA") to care for her daughter.[2] *Id.* BCSS granted Brown's request for intermittent leave on August 13, 2021. *Id.* Brown's daughter passed away in November 2021. ECF 15-2 ¶ 9; 19-1 ¶ 9.

On February 24, 2022, Brown again requested intermittent FMLA leave to care for her minor daughter, "who suffered from serious mental health conditions and was in crisis." ECF 15-4 at 15-17; 19-2 ¶ 3; 20-1 ¶ 3. On March 8, 2022, BCSS approved Brown's second request for intermittent FMLA leave, but notified Brown that she had twenty days of FMLA leave remaining through the end of July 2022, the end of the FMLA year. ECF 15-2 ¶ 10; 19-1 ¶ 10. During the 2021-22 school year, Brown was absent for 84 days and worked fewer than a full day on 23 days. ECF 15-2 ¶ 11; 19-1 ¶ 11.

### 2. 2022-23 school year

On June 28, 2022, before the 2022-23 school year began, Brown submitted a third request for FMLA leave, both to care for her daughter and for her own medical conditions. ECF 15-2 ¶ 12; 15-6 at 3-13; 19-1 ¶ 12. In Brown's amended complaint, she alleged: "as a result [of her daughter's November 2021 death], Ms. Brown suffered from

---

[2] "FMLA leave may be taken intermittently or on a reduced level schedule under certain circumstances. Intermittent leave is FMLA leave taken in separate blocks of time due to a single qualifying reason." 29 C.F.R. § 825.202(a).

ADA-covered mental impairments that substantially limited her major life activities — including major depressive disorder, panic disorder and post-traumatic stress syndrome — which occasionally took over every aspect of her life necessitating medical leave."[3] ECF 6 ¶ 20. When she requested FMLA leave before the start of the 2022-23 school year, Brown submitted a form titled "Certification of Health Care Provider for Employee's Serious Health Condition under the Family and Medical Leave Act." ECF 15-6 at 7. In that form, Brown stated she suffered from the following conditions: "[d]ifficulty concentrating, very tearful, unfocused, [and] forgetful." *Id.* at 10. The form was signed by a health care provider who specialized in mental and behavioral health. *Id.* at 8, 10. BCSS granted Brown intermittent leave for both her daughter and herself for the 2022-23 school year. ECF 15-2 ¶ 12-13; 19-1 ¶ 12-13. In its letter approving Brown's intermittent leave request, BCSS stated that the maximum number of days of leave Brown was entitled to under the FMLA was twelve weeks, or sixty days. ECF 15-6 at 19.

Later in 2022, Brown was diagnosed with Post Traumatic Stress Disorder, Major Depressive Disorder, and panic disorder as a result of her daughter's death. ECF 19-3 ¶ 6; 20-1 ¶ 5. In her declaration, Brown stated that because of her disorders, "there were many days [she] could not stop crying, [she] would suffer multiple panic attacks in one day, and [she] was afraid to leave [her] home." ECF 19-3 ¶ 8. Brown also stated that sometimes at work, she "would go to a private area so [she] could cry." *Id*. According to Brown, her "impairments impacted [her] ability to concentrate and [her] memory." *Id.*

---

[3] Also in her amended complaint, Brown alleges that in January 2022, her disabilities had "worsened to the point she was on the brink of a mental breakdown." ECF 6 ¶ 26. She alleges "[t]here were days [she] could not get out of bed at all or ended up having panic attacks trying to shower." *Id.* ¶ 27. Brown further asserts that her anxiety worsened to the point that "every aspect of her life became debilitating." *Id.* ¶ 28.

The 2022-23 school year began in July 2022. Brown was absent for the first five days of the school year due to surgery, and she was also tardy an additional six days. ECF 15-2 ¶ 14; 19-1 ¶ 14. That month, Brown worked nine full days out of twenty-one working days. *Id.* In August 2022, Brown worked three full days out of twenty-three working days.[4] ECF 15-2 ¶ 15; 19-1 ¶ 15. When she was at work, Brown testified that her disorders were affecting her ability to work effectively. ECF 15-3 at 24:6-14. Specifically, Brown testified that she had difficulty concentrating and that her disabilities affected her memory and her work product. *Id.* at 24:15-19. According to Brown, her disabilities made her feel like she was in a "fog," and she often "couldn't figure out where [her] starting point was." *Id.* at 28:2-19. Brown admits that during this time, she "did not complete her job functions and made errors in the work that she did complete." ECF 15-2 ¶ 16; 19-1 ¶ 16. Brown also testified that during this time, she was unable to meet the hours required for her position, which were 8:00 a.m. to 4:30 p.m., five days a week. ECF 15-3 at 27:18-25.

On September 14, 2022, BCSS moved Brown to a new position—Assistant to the Director of Federal Programs. ECF 15-2 ¶ 17; 19-1 ¶ 17. Brown's supervisor was Caressa Gordon, the Director of Federal Programs. ECF 15-2 ¶ 17; 19-1 ¶ 17.

As Assistant to the Director of Federal Programs, "Brown was responsible for coordinating purchase orders and requisitions for pre-school programs and assisting with the budget and grants." ECF 15-2 ¶ 19; 19-1 ¶ 19. According to the position summary, the Assistant to the Director of Federal Programs had the following essential duties and responsibilities:

---

[4] "In August 2022, Ms. Brown used 18 days of FMLA leave, was absent one day, and was tardy another." ECF 15-2 ¶ 15; 19-1 ¶ 15.

- Maintains records and documentation for fiscal and programmatic audit reviews and compliance monitoring.
- Organizes, coordinates, and monitors efforts for compliance with supplemental extended learning for students.
- Monitors budget requirements and expenditures for supplemental extended learning initiatives.
        ….
- General office management, including clerical assignments.
- Readiness for meetings (e.g., preparation for speeches, notes and reviews of documents/correspondence, etc.).
- Set-up and cleanup for meetings
- Performs other duties as assigned

ECF 15-4 at 28. The position summary also listed performance factors, which included the "[a]bility to be depended on to report to work at the scheduled time and to seldom be absent from work," and the "[a]bility to complete work in a timely, accurate manner and to be conscientious about work performance." ECF 15-2 ¶ 21; 15-4 at 29; 19-1 ¶ 21. Brown received and signed a copy of the position summary on September 15, 2022. ECF 15-2 ¶ 20; 19-1 ¶ 20.

According to Gordon, BCSS switched Brown's position because Brown was "not … able to meet the demands of her position … and the change would set Ms. Brown up for success as Federal Programs had less stringent deadlines as teaching and learning." ECF 15-2 ¶ 18; 15-4 ¶ 19; 19-1 ¶ 18. But even after she switched positions, Brown continued to miss work due to her disabilities. In September 2022, Brown did not work a full day on twenty-one of twenty-one working days.[5] ECF 15-2 ¶ 23; 15-7 at 10-

---

[5] Brown disputes the portion of BCSS's statement of material facts that discuss the number of her absences. ECF 19-1 ¶¶ 23-26. However, Brown does not dispute that BCSS's timesheets accurately reflect when she was and was not present at work. *Id.* Rather, Brown appears to dispute whether certain recorded absences and tardies were for "non-FMLA reasons." *Id.* Brown has provided no evidence to suggest that BCSS's records are inaccurate. Further, in her deposition, Brown acknowledged that during the relevant time, she was unable to be at work from 8:00 a.m. until 4:30 p.m. for five days a week. ECF 15-3 at 27:18-25.

11; 19-1 ¶ 23.[6] In October 2022, Brown worked two full days out of twenty-one working days. ECF 15-2 ¶ 23; 15-7 at 11-12; 19-1 ¶ 23. In November 2022, Brown worked two full days out of seventeen working days. ECF 15-2 ¶ 23; 15-17 at 12-13; 19-1 ¶ 23. In December 2022, Brown worked only one day out of fifteen working days. ECF 15-7 at 13-14. Brown exhausted her sixty days of FMLA leave on December 9, 2022. ECF 15-2 ¶ 24; 19-1 ¶ 24.

Brown often notified Gordon of her absences by texting or emailing her. ECF 15-4 ¶ 27. For example, on September 27, 2022, Brown emailed Gordon at 7:42 a.m.: "I won't be in today. I've had a really bad night and still reeling. Tried getting ready but just can't stop crying and feeling dizzy and nauseous." ECF 15-4 at 51. At 6:24 a.m. the next day, Brown sent another email to Gordon, which stated, "I won't be in today. Can't seem to get myself together to even think. If I can get it together [I] will come in. Just pray. So heavy[.]" *Id.* at 52. The record reflects that Brown was absent from work for the remainder of that week, using four days of FMLA leave. ECF 15-12 at 3; 15-4 at 23. Brown's absences the week of September 27 were not an isolated event; the record shows that many, if not most, of Brown's absences and tardies were because of panic attacks and other disability-related ailments. *See* ECF 15-4 at 51 (Sept. 27, 2022), 52 (Sept. 28, 2022), 55 (Sept. 29, 2022), 56 (Sept. 30, 2022), 59 (Oct. 6, 2022), 60 (Oct. 7, 2022), 63 (Oct. 12, 2022), 64 (Oct. 14, 2022), 72 (Oct. 28, 2022), 77 (Nov. 2, 2022), 78

---

[6] According to Brown's time sheets, in September 2022, she was absent fourteen days for FMLA reasons, she was tardy four days for FMLA reasons, and she was tardy three days for reasons not specified on Brown's time sheets. ECF 15-2 ¶ 23; 15-7 at 10-11; 19-1 ¶ 23. In October 2022, Brown was absent nine days for FMLA reasons, tardy five days for FMLA reasons, left early one day to take her daughter to the dentist, and was tardy three days for unspecified reasons. ECF 15-2¶ 23; 15-7 at 11-12; 19-1 ¶ 23. In November 2022, Brown was absent seven days for FMLA reasons, tardy three days for FMLA reasons, and tardy two days for unspecified reasons. ECF 15-2 ¶ 23; 15-7 at 12-13; 19-1 ¶ 24. In December 2022, Brown was absent seven days for FMLA reasons, absent seven days for non-specified reasons, and tardy for one day due to a doctor's appointment. ECF 15-7 at 13-14.

(Nov. 3, 2022), 79 (Nov. 4, 2022), 93 (Dec. 1, 2022), 95 (Dec. 5, 2022), 96 (Dec. 7, 2022), 97 (Dec. 9, 2022), 99 (Dec. 13, 2022), 100-01 (Dec. 14, 2022), 102 (Dec. 15, 2022), 104 (Dec. 16, 2022), 108 (Dec. 20, 2022), 109-10 (Dec. 21, 2022), 111 (Dec. 22, 2022), 113-14 (Jan. 5, 2023), 115 (Jan. 6, 2023), 206 (Jan. 17, 2023), 138-39 (Jan. 27, 2023), 157 (Feb. 6, 2023). Brown testified that during this time period, she had a "bad day" every day. ECF 15-3 at 39:24-40:2.

*3. BCSS's disciplinary action*

BCSS began sending Brown written warnings regarding her attendance in December 2022. On December 14, 2022, Gordon emailed Brown the following message:

> On the morning of December 14, 2022 you did not report to work, nor did you communicate your absence to me.
>
> As articulated in our conversation later this morning, the expectation for communicating absences is to send me an email before the workday begins.
>
> Please reference pages 14 and 15[7] of the BCSS Handbook.

ECF 15-4 at 101.

On January 5, 2023, Gordon sent Brown a letter informing her that she had missed 14 days of work during that school year, not including days taken for professional leave. ECF 15-9 at 10. The letter informed Brown that "[f]or the remainder of this school year" she would need "to provide a doctor's note to substantiate any sick leave." *Id.*

On January 9, 2023, Human Resources Director Brent Watts sent Brown a letter regarding her absences. ECF 15-1 ¶ 26; 19-1 ¶ 26. That letter, signed and acknowledged by Brown on January 11, 2023, stated:

> Dear Ms. Brown:

---

[7] Pages 14 and 15 are the BCSS attendance policy, discussed in detail below. ECF 15-4 at 213-14.

Since December, you have not reported for work in a consistent manner and your absences are affecting your job performance as well as the performance of other employees. You have not requested leave from your Supervisor for your absences, rather you email your supervisor daily indicating that you will not be reporting to work.

Your chronic absenteeism is not acceptable and cannot be tolerated. Please be advised that an email to your supervisor is not sufficient notice to excuse you from your job duties. The expectation is that you report to work every day and on time. As a reminder, as indicated in the BCSS Handbook, "It is the core conviction of our school system that employee attendance and promptness on the job is not only the mark of a top-notch professional, but it is also a vital duty on behalf of the welfare of the students and the expectations [of] our parents and taxpayers." Continued failure to report to work every day and on time will result in your termination.

ECF 15-7 at 6.

On January 10, 2023, Gordon gave Brown a mid-year performance review. ECF 15-9 at 18-21. Gordon indicated that Brown "need[ed] development" in three categories: quality of work, productivity, and dependability. *Id*. at 21. As feedback, Gordon stated that Brown "inconsistently exhibit[ed] quality and accuracy at work," that she was "[i]nconsistent in accomplishing tasks and maintaining appropriate time management," and that "[a]ttendance ha[d] been an ongoing concern throughout the school year. (This does not include FMLA days which are approved.)." *Id.* Gordon left the following overall comment: "[d]ue to attendance, not including FMLA days, which are approved days, I've had to fulfill the duties and responsibilities of the position." *Id.* Brown signed the performance evaluation on January 10, 2023. *Id.* According to emails exchanged between Brown and Gordon, Brown was tardy or absent at least five times between January 11 and January 26, 2023. ECF 15-4 at 24, 119-133; 15-12 at 7.

On January 26, 2023, Brown met with Gordon and Watts.[8] ECF 15-2 ¶ 29; 19-1 ¶ 29. During the meeting, Brown requested three weeks of leave to attend an intensive outpatient treatment. ECF 15-2 ¶ 29; 19-1 ¶ 29. Brown did not provide a doctor's note or other documentation regarding her request. ECF 15-2 ¶ 30; 19-1 ¶ 30. According to Watts and Gordon, Watts asked Brown to provide documentation of her need to attend the treatment. ECF 15-2 ¶ 29; 15-13 at 29:1-5; 15-4 at 138-139; 15-5 at 34:20-35:2. According to Brown, no such documentation was requested. ECF 19-1 ¶ 29.

Watts testified that he spoke with the BCSS superintendent the day Brown requested the leave of absence. ECF 15-5 at 46:5-11, 48:21-24. According to Watts, after evaluating the procedures and the school's federal programs status, Watts and the superintendent "did not see how [they] would be able to proceed." *Id.* at 46:5-18. However, Watts testified that he and the superintendent agreed to wait to decide on the request. *Id.* at 46:19-23.

On January 27, 2023, Brown was again absent from work because of a panic attack. ECF 15-4 at 138-39; 15-12 at 7. According to Brown's email to Gordon, Watts attempted to call Brown that day, "but [she] was knocked out" to prevent her panic attacks from continuing. ECF 15-4 at 139. That day, Watts sent Brown a final notice regarding her attendance. ECF 15-2 ¶ 32; 19-1 ¶ 32. In the letter, Watts stated:

> Per our meeting on January 11th, 2023, you have not reported for work in a consistent and timely manner and your absences and tardiness are affecting your job performance as well as the performance of other employees.
>
> Your chronic absenteeism and tardiness is not acceptable and cannot be tolerated. As a reminder, as indicated in the BCSS Handbook, "It is the core conviction of our school system that employee attendance and promptness on the job is not only the mark of a top-notch professional, but it is also a

---

[8] Brown asserts that she asked for the meeting to request an accommodation, and BCSS states that Gordon and Watts requested the meeting to discuss Brown's absences. ECF 15-2 ¶ 29; 19-2 ¶ 31.

vital duty on behalf of the welfare of the students and the expectations of our parents and taxpayers. Continued failure to report to work everyday on time and failure to complete assigned duties and responsibilities will result in your termination.

ECF 15-7 at 7.

On January 30, 2023, Watts emailed Brown and informed her that her request for three weeks of leave was denied. ECF 19-2 ¶ 38; 20-1 ¶ 38. In his email, Watts explained that "[Brown's] attendance and promptness to work has been an ongoing concern." ECF 19-2 ¶ 37; 15-4 at 141. According to Watts' email, Brown had "missed over 24 days" of the 2022-2023 calendar year. ECF 15-4 at 141.

After her accommodation request was denied, Brown continued to miss work. Specifically, Brown missed ten additional days of work and was tardy for two days from January 27 through February 21, 2023. ECF 15-2 ¶ 34; 19-1 ¶ 34; 15-12 at 8. On February 21, 2023, Watts and Gordon called Brown and asked her to either resign or face termination due to her absenteeism. ECF 15-2 ¶ 35; 19-1 ¶ 35. Brown did not resign and, thus, Watts and Gordon recommended Brown's termination. ECF 19-2 ¶ 44; 20-1 ¶ 44 The BCSS Board of Education approved Brown's termination on March 14, 2023. ECF 15-2 ¶ 36; 19-1 ¶ 36. BCSS did not hire anyone to fill Brown's position. ECF 19-2 ¶ 43; 20-1 ¶ 43.

*4. Brown's post-termination employment*

After her termination, Brown began attending an intensive outpatient treatment program in May 2023. ECF 15-2 ¶ 37; 19-1 ¶ 37. Brown testified that, rather than the scheduled three weeks, her treatment lasted five weeks. ECF 15-3 at 37:22-23. Following her treatment, Brown testified that she continued to have "bad days" every day for a few months, although Brown contends that her bad days did not interfere with

her ability to work full-time. ECF 15-3 at 40:3-12; 20-1 at 49. According to Brown's statement of material facts, she "has worked full-time off and on since October 2023 and works full-time now." ECF 19-2 ¶ 49. However, the evidence Brown cites does not state whether she began working again in October 2023, much less whether she was able to work full-time. ECF 19-3 ¶ 20.

In her deposition, Brown testified that she had been working since October 2024, when she began selling life insurance by phone. ECF 15-2 ¶ 40; 19-1 ¶ 40. She trained for the first several months and began making calls in January 2025. *Id.* According to Brown, she still had bad days, but her hours were flexible, which allowed her to work around her disabilities. *Id.*; ECF 15-3 at 34:21-35:5. Brown then began working a seasonal job at a marina in May 2025. ECF 15-2 ¶ 41; 19-1 ¶ 41. During the summer, Brown worked five days a week and, depending on the day, her shifts were between five and eight hours long. ECF 15-3 at 33:15-24. After the summer, Brown was no longer needed five days a week, but she still worked some weekends and on a call-in basis. *Id.* at 34:6-12. There is no evidence whether Brown worked another job after the summer of 2025. At that point, Brown was able to manage her disabilities better, but she testified she still had bad days "at least [ ] once a week." *Id.* at 35:9-20.

## B. Procedural History

Brown timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 5, 2023. ECF 6 ¶ 6. The EEOC dismissed Brown's charge and gave her a notice of her right to sue on April 5, 2024. *Id.* ¶ 7. Brown filed her complaint on July 3, 2024, and amended her complaint on October 2, 2024. ECF 1; 6. In her amended complaint, Brown asserts three claims: (1) "Violation of ADA – Regarded as Disabled"; (2) "Actual Discrimination and Failure to Accommodate in

violation of ADA"; and (3) "Retaliation in Violation of the ADA." ECF 6 ¶¶ 37-69. On September 24, 2025, the defendants moved for summary judgment on all of Brown's claims. ECF 15.

## II. STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson,* 477 U.S. at 248. The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex*, 477 U.S. at 324) (alterations in original). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249-50). Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

### III. DISCUSSION

BCSS argues that Brown cannot prevail on her ADA discrimination claims because (a) Brown is not a qualified individual under the ADA, and (b) even if she is, Brown cannot show that BCSS failed to provide her a reasonable accommodation or that BCSS terminated her because of her disability.[9] ECF 15-1 at 6-15. Regarding Brown's retaliation claim, BCSS contends that it is entitled to summary judgment

---

[9] BCSS also argues, perfunctorily, that Brown's ADA Discrimination claims fail because BCSS did not regard Brown as disabled under the ADA. ECF 15-1 at 6-7. But there is evidence that BCSS "knew [Brown] had an actual impairment or perceived [her] to have such an impairment," as required to prove that an employee was regarded as disabled. *Equal Employment Opportunity Commission v. STME, LLC*, 938 F.3d 1305, 1316 (11th Cir. 2019). As BCSS concedes, Brown requested FMLA leave for herself as well as for her daughter before the 2022-23 school year, and Brown's request provided details from a mental and behavioral healthcare provider regarding her condition. ECF 15-6 at 6-12. Moreover, Brown sent her supervisors several emails throughout the school year discussing her panic attacks in detail. *See, e.g.*, ECF 15-4 at 31, 108-11. Thus, the facts are, at the very least, disputed as to whether BCSS knew or believed that Brown had a disability and, thus, whether BCSS regarded Brown as disabled.

because Brown cannot establish BCSS was motivated by retaliatory or discriminatory animus. *Id.* at 16-18.

## A. ADA Discrimination

In Count One, Brown claims that BCSS terminated her because it regarded her as disabled. ECF 6 ¶¶ 37-46. In Count Two, Brown claims that she was actually disabled under the ADA, and that BCSS discriminated against her by failing to provide her requested accommodation and by terminating her employment because of her disability. *Id.* ¶¶ 47-59. Both Counts assert ADA Discrimination claims under 42 U.S.C. § 12112(a).

Title I of the ADA makes it unlawful for employers to discriminate against an otherwise qualified individual based on disability. 42 U.S.C. § 12112(a). A plaintiff establishes ADA discrimination by showing (1) she has a disability; (2) she is a qualified individual under the ADA; and (3) the employer discriminated against her "on the basis of disability." *See Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023); 42 U.S.C. § 12112(a); *see also Akridge v. Alfa Insurance Cos.,* 93 F.4th 1181, 1192 (11th Cir. 2024) (holding that § 12112(a) still imposes a "but-for" causation standard after the 2008 amendment to the ADA). Discrimination under the ADA includes an employer's failure to provide a reasonable accommodation and termination because of disability. *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007). Brown's complaint asserts that BCSS did both. ECF 6 ¶¶ 37-59.

### 1. Qualified individual

First, the Court considers whether Brown was a "qualified individual" under the ADA. A "qualified individual" is an "individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that

-14-

such individual holds or desires." 42 U.S.C. § 12111(8). In other words, if the employee is unable to perform an essential function of her job, even with a reasonable accommodation, then she is not a qualified individual under the ADA. *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000). Whether a job function is essential is evaluated on a case-by-case basis by examining a number of factors. *Holly*, 492 F.3d at 1258. Consideration is given to the employer's written description of the disabled employee's job and the employer's judgment as to whether a job function is essential. *See* 42 U.S.C. § 12111(8); *Holly*, 492 F.3d at 1257. Other factors for consideration include (1) the amount of time spent performing the function; (2) the consequences of not requiring the employee to perform the function; (3) the work experience of former employees; (4) the current work experience of current employees in similar roles; and (5) the terms of a collective bargaining agreement, if available. *See* 29 C.F.R. § 1630.2(n).

BCSS contends that Brown was not a qualified individual because her chronic absenteeism prevented her from performing the essential functions of her position. ECF 15-1 at 7-12. A summary of the more relevant absences is appropriate. Beginning in the first half of 2022, Brown was absent both because of her disability and to care for her minor daughter. ECF 6 ¶ 20; ECF 15-2 ¶ 12; 15-6 at 3-13; 19-1 ¶ 12. For the entire 2021-22 school year, Brown was absent for eighty-four days and worked less than a full day for twenty-three days. ECF 15-2 ¶ 11; 19-1 ¶ 11. During the fall semester of the 2022-23 school year, Brown was absent for sixty-eight days, and she worked less than a full day for twenty-eight days. ECF 15-2 ¶¶ 23-24; 15-7 at 8-14; 19-1 ¶¶ 23-24. During that period, Brown exhausted her sixty days of approved FMLA leave. ECF 15-2 ¶ 24; 19-1 ¶ 24. From January 1, 2023, until she was terminated on February 21, Brown

missed an additional twenty-one days of work and worked less than a full day for four days. ECF 15-12 at 7-8. In total, Brown accrued twenty-eight non-FMLA absences and worked less than a full day for thirty-two days during the 2022-23 school year. In other words, Brown worked only twenty-five full days during the school year. ECF 15-4 at 19-24; 15-12 at 1-8; 15-7 at 8-15. While some of Brown's non-FMLA absences were requested for other reasons, Brown's emails to Gordon reveal that many of Brown's non-FMLA absences were related to her disabilities. ECF 15-4 at 98-108, 113-114, 138-140, 157.

It is settled that regular attendance is required to perform the essential functions of many, if not most, positions. *See Jackson v. Veterans Admin.,* 22 F.3d 277, 278-79 (11th Cir. 1994) ("Because [the Plaintiff] was absent numerous times within the first few months of his probationary employment on a sporadic, unpredictable basis, he could not fulfill this essential function of his employment, that of being present on the job, and was not otherwise qualified."); *Tyndall v. National Educ. Centers, Inc. of California*, 31 F.3d 209, 213 (4th Cir. Cir. 1994) ("In addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis."); *Meade v. General Motors, LLC*, 317 F. Supp. 3d 1259, 1274 (N.D. Ga. 2018) ("Courts have consistently held that the ability to be present on the job and to complete all assigned tasks within a reasonable period of time is essential to any job.") (citation modified)).

The written job description for Brown's position, Executive Secretary to the Director of Federal Programs, listed the following performance factors: (1) the "[a]bility to be depended on to report to work at the scheduled time and to seldom be absent from work"; and (2) the "[a]bility to complete work in a timely, accurate manner and to be

conscientious about work performance." ECF 15-4 at 28-29. The job description's "essential[] duties and responsibilities" also required regular and predictable attendance at work. *See, e.g.*, *id.* at 28 ("Maintains records and documentation for fiscal and programmatic audit reviews and compliance monitors"; "Organizes, coordinates, and monitors efforts for compliance for supplemental extended learning for students."; "General office management, including clerical assignments"; "Readiness for meetings.").

Moreover, BCSS's attendance policy supports the conclusion that regular attendance was an essential function of Brown's position. BCSS's employee handbook states:

> It is the core conviction of our school system that employee attendance and promptness on the job is not only the mark of a top-notch professional, but it is also a vital duty on behalf of the welfare of the students and the expectations of our parents and taxpayers.
> ….
>
> The Butts County School System supports the research that indicates a total of 10 days away during a 180-day school year is reasonable for the maximum rate of absenteeism.

*Id.* at 213-14. Additionally, several of the remaining factors provided in 29 C.F.R. § 1630.2(n) demonstrate that regular attendance was required for Brown to perform the essential functions of her position. The relevant factors include the consequences of not requiring the employee to perform the function and the experience of current and former employees. 29 C.F.R. § 1630.2(n)(iv), (vi), (vii). There is undisputed evidence that, because of Brown's absences, her work product suffered, and that other employees, including Brown's supervisor, had to complete work assigned to Brown. *See, e.g.,* ECF 15-2 ¶ 16; 15-13 at 22:11-23:5; 19-1 ¶ 16. And Brown has produced no evidence that BCSS permitted other former or current employees with similar attendance records to

continue working at the school system. Thus, BCSS has provided unrefuted evidence that attendance was an essential function of Brown's position.

The settled law that regular attendance is essential to job performance and the undisputed fact that Brown could not perform the essential functions of her job when absent confirm the obvious—an employee who can't show up for work, can't do her work.[10] But Brown contests the obvious, and in a creative way. She argues that the position summary does not demonstrate that attendance is an essential function because attendance is addressed in the "performance factors" section of the job description rather than the "essential duties" section. ECF 19 at 7. And because the attendance policy was applied "subjectively," Brown argues attendance is not part of her prima facie case. *Id.* at 7-8. Rather, her chronic absenteeism is only relevant to "the pretext stage." *Id.* at 6.

Brown believes she finds support for her argument in *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 768-69 (11th Cir. 2005). *Id.* at 7-8. In *Vessels*, the Eleventh Circuit held that the plaintiff established a prima facie case of disparate treatment under Title VII, § 1981, and § 1983 because he presented evidence that he met the objective qualifications of a position for which he applied, despite the employer's argument that the plaintiff was unqualified because he lacked the employer's preferred management style. 408 F.3d at 768-69. The Eleventh Circuit declined to consider evidence of subjective job qualifications, such as a management style preference, in the prima facie case stage of the *McDonnell Douglas* analysis because

---

[10] Remote work positions are an obvious exception. Indeed, Brown's argument, in part, is a typical argument in remote work disputes—presence at the workplace is not necessary to perform job duties. But only in part, because she never argues that she could perform her job duties remotely.

such considerations would foreclose the plaintiff's opportunity to prove pretext. *Id.* at 769.

*Vessels* has nothing to say about the qualified individual element of an ADA claim. It addresses only the qualifications prong of a Title VII *McDonnell Douglas* prima facie case and makes clear that, in a Title VII case, *McDonnell Douglas* looks only to the most basic qualifications and leaves the fight over the employee's performance of job duties to the pretext stage. *Id.* Brown, though, claims she was discriminated against because of her disability and thus must establish that she is a qualified individual, and she is a qualified individual only if she can perform her job duties, with or without reasonable accommodation. 42 U.S.C. § 12111(8). Thus, she must necessarily address whether she could actually perform her job duties, not merely whether she possessed the stated qualifications for her job.

In any event, whether Brown must attend work is an objectively verifiable "qualification," indeed, as noted, an obviously essential qualification. And Brown, because she punts on the issue, never says how she could do her work if she couldn't show up for work.[11] Thus, there is unrefuted evidence that, because of her poor attendance, Brown could not complete her required tasks, and other employees had to complete her unfinished work. ECF 15-13 at 22:11-23:5. Brown has, therefore, failed to

---

[11] In her response, Brown mentions that she "worked successfully for the school district for over 20 years until one daughter became ill and ultimately passed away from cancer, another daughter suffered a major mental health crisis, and Ms. Brown herself suffered a mental health crisis." ECF 19 at 6. The point is unclear. Certainly, BCSS allowed Brown to miss work many, many days. Perhaps she was "successful" because BCSS allowed her to miss work. But there is no evidence that she successfully performed her job duties when she was chronically absent. Brown's prior work experience does not demonstrate that she was able to perform the essential functions of her job, with or without an accommodation, when her chronic absenteeism began. *See Goble v. City of Smyrna, Georgia*, 240 F. Supp. 3d 1351, 1376 (N.D. Ga. 2017) ("[I]n the ADA context, the Court has recognized that an individual's ability to continue performing the essential functions of the job may change or devolve over the course of an employee's tenure.").

provide evidence by which a reasonable jury could find that she could perform the essential functions of her position without an accommodation, given her inability to regularly attend work.

Nor has Brown provided evidence that she could perform the essential functions of her position with a reasonable accommodation. Brown contends that with her requested disability accommodation—a three-week leave of absence for an intensive outpatient treatment—she would have been able to perform her essential job functions notwithstanding her long-lived chronic absenteeism. ECF 19 at 6. However, Brown points only to her own speculation that she is "certain [she] would have improved faster" if she had been able to receive treatment. ECF 19-3 ¶ 23. Brown's speculative statements are not evidence that her treatment would have had such an effect. *See Billups v. Emerald Coast Utils. Auth.*, 714 F. App'x 929, 934 (11th Cir. 2017) (concluding that a requested leave was unreasonable when the plaintiff failed to show "his requested accommodation would have allowed him to return to work in the present or immediate future.") (citation modified)); *Corodoba v. Dillard's, Inc.*, 419 F.3d 1169 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact." (emphasis omitted)). And Brown provides no medical records or other evidence that suggests outpatient treatment would, or did, have the desired effect. Indeed, as discussed below, Brown attended the outpatient treatment after her termination, and she still fails to provide evidence that it had the intended effect.

Accordingly, the Court concludes that Brown was not a qualified individual under the ADA. BCSS is, therefore, entitled to summary judgment on Brown's ADA discrimination claims.

*2. Failure to accommodate*

Even if Brown were a qualified individual, she has not provided evidence that BCSS failed to accommodate her in violation of the ADA. To prevail on an ADA failure to accommodate claim, a plaintiff must show that (1) she is disabled, (2) she is qualified, (3) her employer failed to provide her with a reasonable accommodation, and (4) "that failure negatively impact[ed] [her] hiring, advancement, discharge, compensation, training, [or] other terms, conditions, and privileges of [her] employment." *Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023); *Holly*, 492 F.3d at 1255-56, 1263 n.17.

The employee, at the summary judgment stage, bears the burden of producing evidence that a reasonable accommodation was available. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255-56 (11th Cir. 2001). "An accommodation can qualify as 'reasonable,' and thus be required by the ADA, only if it enables the employee to perform the essential functions of the job."[12] *Id.* at 1255. "'Essential functions' are the fundamental job duties of a position that an individual with a disability is actually required to perform." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000); 29 C.F.R. § 1630.2(n)(1). Where an employee cannot identify a reasonable accommodation, "the employer has no affirmative duty to show undue hardship." *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016). Finally, because "an employer's failure to reasonably accommodate a disabled individual *itself* constitutes

---

[12] The Eleventh Circuit questioned this definition in *Beasley*. 69 F.4th at 756-58. However, the concurrence in *Beasley* argued that the definition as stated in *Lucas* was not dicta and is a governing rule. *Id.* at 761-62 (Luck, J. concurring). In any event, Brown does not argue that BCSS's obligation to reasonably accommodate her stretched beyond the essential functions of her position. *See Beasley*, 69 F.4th at 758-60 (declining to adopt a new reasonable accommodation definition because the "requested accommodations … involve[d] essential functions").

discrimination," the "*McDonnell Douglas* burden-shifting [framework] is not applicable to reasonable accommodation cases." *Holly*, 492 F.3d at 1262; *see Nadler v. Harvey*, 2007 WL 2404705, at *9 (11th Cir. Aug. 24, 2007).

BCSS argues that Brown's requested accommodation—three weeks of leave for an intensive outpatient treatment—was unreasonable because there is no evidence that the outpatient treatment would have allowed her to attend work regularly. ECF 15-1 at 15.

Brown has not produced evidence that her requested accommodation was reasonable. To demonstrate her requested accommodation's reasonableness, Brown cites only her declaration, in which she states that if she had been given leave, she "intended to immediately attend intensive outpatient treatment and return to work full-time at the end of that treatment." ECF 19 at 13-14; *see* 19-3 ¶ 20. Brown also stated that she is "certain" that she "would have improved faster because working gives [her] purpose and forces [her] to get out of the house." *Id.* ¶ 23. But again, Brown's speculative and conclusory argument that the intensive treatment would have worked, without some prediction that her health would improve, is not sufficient evidence from which a reasonable jury could find that Brown's requested accommodation was reasonable. *See Billups*, 741 F. App'x at 934. On the contrary, it seems the outpatient treatment did not have the desired effect. Brown's treatment lasted two weeks longer than expected, and she did not work full-time for over a year after her treatment, and she continued to have "bad days" into 2025. ECF 15-2 ¶ 40; 19-1 ¶ 40; 15-3 at 36:22-37:23, 40:3-12. As noted, Brown has failed to provide any medical records to support her speculation that the three-week outpatient treatment would have or did allow her to return to work full-time. Without some evidence that the outpatient treatment enabled

Brown to meet the attendance requirements of a full-time position, or at least that it *could* have, Brown has failed to demonstrate that three weeks of leave was a reasonable accommodation.

Accordingly, the Court concludes that Brown has failed to provide evidence that BCSS failed to accommodate her under the ADA.[13]

*3. Disability discrimination – termination*

Brown also claims that BCSS discriminated against her under the ADA by terminating her because of her disability. ECF 19 at 16-17. This claim is necessarily a disparate treatment claim. *See Akridge*, 93 F.4th at 1194 ("[The Plaintiff's] claim that she was discriminated against based on her disability-related healthcare costs is necessarily a claim of disparate treatment."); *Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale*, 46 F.4th 1268, 1275-76, 1278 (11th Cir. 2022).

Unlike her failure to accommodate claim, Brown's disparate treatment claim requires her to provide evidence of intentional discrimination. *See Mullin v. Sec'y, U.S. Dep't of Veterans Affairs*, 162 F.4th 1296, 1303 (11th Cir. 2025). Direct evidence of intentional discrimination in employment cases is rare. The *McDonnell Douglas*[14] framework affords plaintiffs one means of marshaling circumstantial evidence to defeat an employer's summary judgment motion. More generally, plaintiffs can use the "convincing mosaic standard," which is really just "a stand-in for the Rule 56 summary judgment standard applied to employment discrimination." *Ismael v. Roundtree*, 161 F.4th 752, 760 (11th Cir. 2025).

---

[13] Because Brown has failed to identify a reasonable accommodation, the Court need not consider whether BCSS has demonstrated undue hardship. *See Frazier-White*, 818 F.3d at 1255.

[14] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

The *McDonnell Douglas* three-part framework first requires a plaintiff to establish a prima facie case of discrimination. Again, to establish a prima facie case of disability discrimination, Brown must provide evidence that (1) she has a disability; (2) she is a qualified individual under the ADA; and (3) the employer discriminated against her "on the basis of disability." *See Beasley,* 69 F.4th at 754 (11th Cir. 2023); 42 U.S.C. § 12112(a); *see also Akridge*, 93 F.4th at 1192 (holding that § 12112(a) still imposes a "but-for" causation standard after the 2008 amendment to the ADA). "The third prong requires a plaintiff to prove that '[s]he was treated less favorably than a similarly situated, non-disabled person.'" *Wilkie v. Outokumpu Stainless USA, LLC*, 2025 WL 3079343, at *1 (11th Cir. Nov. 4, 2025) (quoting *Akridge*, 93 F.4th at 1194).

If a plaintiff establishes a prima facie case, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. *Tex. Dep't of Cnty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981). This burden of production means the employer "need not persuade the court that it was *actually* motivated by the proffered reasons" but must produce evidence sufficient to raise a genuine issue of fact as to whether it discriminated against the plaintiff. *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (emphasis added) (citation modified).

If the employer provides an adequate reason, a plaintiff then "has the opportunity to demonstrate that the employer's proffered rationale is pretextual." *Ismael*, 161 F.4th at 759. To show pretext, a plaintiff must show that the employer's reason was false and that discrimination was the real reason for the adverse action. *Id.* at 761 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). Of course, this showing may be

made by circumstantial evidence. Indeed, the pretext step of *McDonnell Douglas* is a "*subset* of potentially relevant circumstantial evidence." *Id.* at 762.

If a plaintiff hasn't shown (or hasn't attempted to show) a prima facie case or pretext under *McDonnell Douglas*, the Court turns to the convincing mosaic standard to determine if the record, viewed in a light most favorable to the plaintiff, would allow a jury to infer intentional discrimination. *Id.* at 764. Notably, the convincing mosaic standard cuts both ways. Even if a plaintiff successfully navigates *McDonnell Douglas,* an employer may yet be entitled to summary judgment if the record establishes that "no rational jury could conclude that the termination was discriminatory [or retaliatory]." *See Motley v. Fulton Cnty.,* Ga., 815 F.3d 733, 734 (11th Cir. 2016) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)) (other citations omitted).

Again, Brown cannot recover under this claim because she was not a qualified individual under the ADA. But even if she were, her disparate treatment claim still fails. While Brown argues that she has established a prima facie case of disability discrimination, she has not because there is no evidence that a similarly situated individual without a disability was treated more favorably than her. *Wilkie*, 2025 WL 3079343, at *1; ECF 19 at 16. Clearly, Brown recognizes this because she immediately jumps into a convincing mosaic argument. ECF 19 at 16.

A plaintiff can always survive summary judgment by creating a triable issue concerning the employer's discriminatory intent. *See Ismael*, 161 F.4th at 764–65; *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Convincing mosaic evidence may include: "(1) suspicious timing, ambiguous statements ..., and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the

employer's justification is pretextual." *Lewis v, City of Union City, Georgia*, 934 F.3d 1185, 1185 (11th Cir. 2019) (citation modified); *see also Ismael*, 161 F.4th at 764 ("[a] showing of pretext (or lack thereof) would certainly be relevant. But a plaintiff's inability to disprove the defendant's rationale cannot be the sole grounds for summary judgment").

Brown asserts that two circumstances create a convincing mosaic of intentional discrimination. ECF 19 at 16-17. First, Brown contends that the "suspicious timing between her request for accommodation and her termination" demonstrates intentional discrimination. *Id.* at 16. Second, Brown contends that intentional discrimination can be inferred because she "was not counseled, disciplined, or terminated until she needed accommodation for her own mental health disabilities and not her daughters' illnesses …." *Id.* at 17. However, the record demonstrates that BCSS warned Brown that her absences were a problem before her January 26, 2023 accommodation request. For example, as early as December 2022, Gordon emailed Brown to warn her that she needed to communicate with Gordon regarding her absences. ECF 15-4 at 101. On January 5, Gordon informed Brown that she had exceeded the number of non-FMLA absences permitted by the BCSS attendance policy. ECF 15-9 at 10. Further, on January 9, Watts sent Brown a letter warning her that her "chronic absenteeism" was unacceptable and could result in termination. ECF 15-9 at 15. Thus, Brown's assertion that she was not disciplined "until she needed accommodation for her own mental health disabilities" is not supported by the record. ECF 19 at 17.

Rather, she requested a three-week accommodation only after a series of warnings about her continued absences. Then, after BCSS denied Brown's accommodation request on January 30, 2023, she quickly missed at least ten more

-26-

days of work before Watts and Gordon asked her to resign on February 21, 2023. ECF 15-2 ¶ 34; 19-1 ¶ 34; 15-12 at 8. Brown's prior and subsequent absences, far from "suspicious timing," dispel any reasonable inference that BCSS terminated Brown's employment because of her accommodation request.[15]

Accordingly, BCSS's motion for summary judgment on Brown's ADA Discrimination claims (Counts One and Two) is **GRANTED**.

## B. ADA Retaliation

Next, BCSS moves for summary judgment on Brown's ADA retaliation claim. Like ADA discrimination claims, a plaintiff can prove ADA retaliation by either navigating the *McDonnell Douglas* framework or by creating a convincing mosaic of evidence that, viewed in the light most favorable to Brown, would allow a jury to infer intentional discrimination. *Batson v. Salvation Army*, 897 F.3d 1320, 1328-29 (11th Cir. 2018); *Yelling v. St. Vincent's Health Sys.,* 82 F.4th 1329, at 1337-38 (11th Cir. 2023).[16]

To establish a prima facie case of retaliation, "a plaintiff must show that (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse employment action." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 798 (11th Cir. 2000)."The third element requires a showing of but-for causation." *Frazier-White*, 818 F.3d at 1258.

---

[15] The Eleventh Circuit has made clear that "intervening discovery of misconduct fatally undermines the probative value of temporal proximity between [ ] protected activity and [ ] termination." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1312 (11th Cir. 2023).

[16] ADA retaliation claims are analyzed under the same framework used in Title VII retaliation claims. *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1287 (11th Cir. 1997).

First, BCSS contends Brown has not shown a prima facie case of retaliation. ECF 15-1 at 16-17. BCSS does not dispute that Brown's accommodation request was a protected activity or that her termination was an adverse employment action. *Id.* Rather, BCSS argues that Brown has not shown causation because she only requested an accommodation after the January 9, 2023, letter informed her that she was subject to dismissal. ECF 20 at 9. That letter, BCSS argues, "negates any logical inference of causation." *Id.* (quoting *Frazier-White*, 818 F.3d at 1258). *Frazier-White* is arguably distinguishable because there, the employer informed Frazier that her termination had been recommended before she requested an accommodation. 818 F.3d at 1258. Here, BCSS's January 9, 2023, letter fell just short of that—it warned Brown that termination would occur if her attendance problems persisted. ECF 15-2 ¶ 26; 19-1 ¶ 26. Giving Brown the benefit of the doubt, the Court agrees she has established some temporal proximity between her accommodation request and her termination and, thus, has provided sufficient evidence of a prima facie case of ADA retaliation.

Because Brown has established a prima facie case, the Court considers whether BCSS has proffered a legitimate, non-discriminatory reason for Brown's termination. The Court concludes it has. BCSS contends that it terminated Brown for one reason— poor attendance. Brown worked less than thirty full days during the 2022-23 school year. ECF 15-4 at 19-24; 15-12 at 1-8; 15-7 at 8-15. Brown's supervisors testified, and she admits, that her attendance impacted her ability to do her job. ECF 15-2 ¶ 5, 16-17; 19-1 ¶ 5, 16-17, 15-13 at 22:7-23:20. Brown's poor attendance is, therefore, a legitimate, nondiscriminatory reason for termination.

Again, to demonstrate pretext, Brown must provide evidence that BCSS's reason for termination was false and that it was pretext for retaliation. *Ismael*, 161 F.4th at 761.

Brown argues that BCSS set her up to be terminated based on attendance by denying her accommodation.[17] *See* ECF 19 at 18-19. Brown's speculation regarding BCSS's motives, without more, is not sufficient to raise an inference of pretext. *See Gilliard v. Georgia Dep't of Corr.*, 500 F. App'x 860, 865 (11th Cir. 2012) ("[C]onclusory allegations or unsupported assertions of discrimination, without more, do not raise an inference of pretext where an employer has offered extensive evidence of legitimate, nondiscriminatory reasons for its actions." (citing *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996)). Moreover, there is nothing in the record to demonstrate that BCSS's legitimate, non-discriminatory reason for terminating Brown was false. Thus, Brown has failed to establish pretext.

Finally, even when viewed in the light most favorable to Brown, the record does not demonstrate a convincing mosaic of evidence that would allow a reasonable jury to infer retaliation. The only evidence Brown has provided is that she was given a final notice regarding attendance the day after she requested an accommodation, that she was terminated one month after she requested leave, and that she believes BCSS set her up for termination based on attendance by denying her accommodation request. ECF 19 at 17-19. But again, the January 27, 2023, final notice was not the first time Brown was reprimanded for her absences. Gordon emailed Brown twice in December 2022 to remind Brown of the attendance policy and the proper procedures for requesting days off. ECF 15-4 at 101; 15-9 at 1. Gordon then sent Brown a letter on January 5, 2023, informing her that she exceeded BCSS's maximum rate of absenteeism. ECF 15-9 at 10. On January 9, 2023, Watts notified Brown that continued

---

[17] Brown does not state whether this argument is meant to prove pretext or to demonstrate a convincing mosaic. Either way, as stated, the alleged set-up does not demonstrate intentional discrimination.

absenteeism would result in her termination. *Id.* at 15. And on January 27, the same day Watts sent Brown a final notice regarding her absences, Brown was again absent from work and missed a phone call from Watts. ECF 15-4 at 139. Brown's absences, and the record of reprimands, both before and after Brown requested an accommodation, foreclose any reasonable inference that BCSS terminated her in retaliation for requesting an accommodation. And Brown provides no evidence that BCSS intended to set her up for termination by denying her accommodation request. On the contrary, the convincing mosaic analysis cuts against Brown. *See Motley*, 815 F.3d at 734. Brown was repeatedly absent during the 2022-23 school year, sometimes for weeks at a time, which required her colleagues and supervisors to step in and perform her assigned work. Brown requested an accommodation only after she was warned several times that her absenteeism was a problem that could result in termination. Then, after her accommodation request was denied, Brown continued to miss work. On this record, no jury could reasonably infer BCSS terminated Brown with retaliatory or discriminatory intent.

Accordingly, BCSS's motion for summary judgment on Brown's ADA retaliation claim (Count Three) is **GRANTED**.

## IV. CONCLUSION

For the reasons discussed above, BCSS's motion for summary judgment (ECF 15) is **GRANTED.**

**SO ORDERED**, this 3rd day of June, 2026.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

-30-